IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHON M. BENNETT | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CORRECTIONAL OFFICER | : | NO. 11-176 |
| WASHINGTON, et al. | | |

## MEMORANDUM

**Padova, J.**                                                    **February 19, 2015**

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 alleging violations of his civil rights arising out of a prison assault in his unlocked cell and subsequent medical care. The Defendants are the City of Philadelphia and several of its employees: Correctional Officers ("COs") Sharon Neal and Clifton Washington, Lieutenants Elizabeth Henry and Danielle Lynn, and Sergeants Michael Sporango and Malachi White. Defendants have moved for summary judgment under Federal Rule of Civil Procedure 56(a). For the following reasons, we grant the Motion in part, and deny it in part.

## I.      BACKGROUND

On November 19, 2009, Plaintiff was an inmate at the Curran Fromhold Correctional Facility ("CFCF"), which is part of the Philadelphia Prison System ("PPS"). (Bennett Dep. at 6, 8.) At 4:30 p.m., he was attacked by a number of unknown assailants who entered his cell, which was unlocked. (Id. at 10-11.) Plaintiff was punched repeatedly and suffered six stab wounds. (Id. at 11-12.) Prior to the attack, Plaintiff had no reason to fear that he would be stabbed, and he did not inform any guards that he thought he would be stabbed. (Id. at 10-11.)

A.      Actions of Correctional Officers on Plaintiff's Housing Unit

COs Neal and Washington were on duty in Plaintiff's housing unit at the time he was

attacked, and have testified that several cell doors were open when they began their shifts at 3:00 p.m. (Neal Dep. at 10-11, 21-22; Washington Dep. at 13.) According to CO Washington, he locked all of the cell doors when his shift began. (Washington Dep. at 13-14.) CO Neal testified that she and CO Washington "go around locking the [open] doors" when they begin their shift. (Neal Dep. at 22.) On November 19, 2009, however, CO Neal reported that "several" cell doors were open during her 4:30 p.m. tour (id. at 23), and that she asked Plaintiff at 4:32 p.m. if he wanted to come out before she secured his unlocked cell (id. at 27-28; Pl.'s Ex. O).[1]

Tours of Plaintiff's housing unit were logged at 3:18 p.m. (by CO Neal), 4:08 p.m. (by CO Washington), 4:21 p.m. (by CO Washington), 4:32 p.m. (by CO Neal), and 4:55 p.m. (by CO Neal). (Pl.'s Ex. D at 9.) CO Washington also reported that he conducted tours of Plaintiff's housing unit at 5:25 p.m. and 5:50 p.m. (Id.)

CO Washington asked Plaintiff at 5:00 p.m. if he wanted his food tray, but Plaintiff responded that he did not want to eat because he was tired. (Washington Dep. at 14-15.) CO Washington further testified that each time he toured Plaintiff's housing unit, Plaintiff was lying down on his bed, facing the wall, and said that he did not want to get up because he was tired. (Id. at 21.) In contrast, CO Neal testified that Plaintiff was standing during each of her tours. (Neal Dep. at 13-14.)

Plaintiff testified that he was in a tremendous amount of pain after the attack and that he had difficulty moving. (Bennett Dep. at 12.) He managed to get up from the floor and lay down on his bed. (Id. at 12-13.) He was bleeding from all of his wounds, but not profusely. (Id. at 13.) Plaintiff testified that COs Washington and/or Neal were alerted to his stabbing at approximately 6:30 p.m. or 6:35 p.m. (id. at 13-14), but COs Washington and Neal stated that

_____

[1] All citations to Plaintiff's or Defendant's exhibits are to the exhibits attached to the briefs pertaining to Defendant Prison Health Service's Motion for Summary Judgment.

they became aware of the stabbing at 5:50 p.m. (Pl.'s Exs. O, P).  CO Washington testified that he learned of the stabbing from CO Neal, who had asked Plaintiff why he was standing in the doorway of his cell, to which Plaintiff responded, "because I was stabbed."  (Neal Dep. at 14-16; Washington Dep. at 10.)  Once CO Washington arrived on the scene, CO Neal immediately called Sergeant White.  (Neal Dep. at 16.)  Sergeant White testified that the COs informed him of the stabbing at 6:00 p.m. and that he called the medical unit because "[y]ou have to send them down to medical."  (White Dep. at 23-24, 31.)  Sergeant White arrived on the scene within seconds.  (Washington Dep. at 32; White Dep. at 31.)

Less than a minute after CO Washington was informed of the stabbing, either he or Sergeant White took Plaintiff out of his cell to the Sally port, a controlled entryway into and out of Plaintiff's housing unit.  (Neal Dep. at 16-17; Washington Dep. at 32; Pl.'s Exs. O, P.)  Before Plaintiff was taken to the medical unit, Sergeant White asked Plaintiff what had happened and told him that he would be sent to the medical unit.  (Bennett Dep. at 14-15; White Dep. at 24-27.)  Plaintiff informed Sergeant White that the stabbing had "occurred inside [his] unlocked multipurpose room" and that "a number of inmates" had stabbed him.  (Bennett Dep. at 15.)  He also informed Sergeant White that he was in a great deal of pain and was experiencing shortness of breath.  (Id. at 18.)  Sergeant White testified, however, that Plaintiff had no visible injuries.  (White Dep. at 24-25.)

Plaintiff testified that when he told Sergeant White that he had been attacked in his unlocked cell, CO Washington admitted to Sergeant White that he had failed to secure Plaintiff's cell door.  (Bennett Dep. at 15.)  CO Washington testified, however, that he had "locked everything," including Plaintiff's cell door, when he made his first tour after beginning his shift.  (Washington Dep. at 13-14, 20.)  CO Washington further testified that in his conversation with

Sergeant White, he merely recounted the fact that several cell doors had been open when his shift began.  (Id. at 29.)

CO Washington stated that he, Plaintiff, and Sergeant White were only in the Sally port for a matter of seconds and that Plaintiff was then taken to the medical unit.  (Id. at 27-28.)  CO Neal testified that she witnessed the conversation in the Sally port between Sergeant White and Plaintiff.  (Neal Dep. at 17.)  Sergeant White testified that Plaintiff was taken to the medical unit "right away" once he arrived on the scene.  (White Dep. at 32.)

Plaintiff also testified that before he was taken to the medical unit, he was taken to the unit management area, where he was questioned by a correctional officer named Edwards for approximately ten minutes.  (Bennett Dep. at 15, 18.)  Plaintiff reports that CO Edwards asked him who had stabbed him, where it occurred, what the assailants looked like, and what their names were.  (Id. at 15.)  Plaintiff informed her that he did not know who had stabbed him.  (Id. at 16.)  According to Plaintiff, he was then left unsupervised in the unit management area for twenty or twenty-five minutes before he was taken to the medical unit.[2]  (Id. at 17-18.)

B.    The Medical Ward

One or two rovers took Plaintiff to the medical unit at approximately 7:15 p.m. or 7:30 p.m.[3]  (Bennett Dep. at 14, 18; Neal Dep. at 18; Washington Dep. at 28; White Dep. at 27; Boggio Verification at 2.)  It takes anywhere from one to five minutes to get from Plaintiff's housing unit to the medical ward.  (Henry Dep. at 23-24; Lynn Dep. at 34-35; White Dep. at 22.)

_____

[2] Plaintiff's testimony about being taken to the unit management area and questioned there is uncorroborated.  The prison officials testified that they either did not recall whether this occurred (Henry Dep. at 14; Neal Dep. at 19-20; White Dep. at 27-28), or did not see, or could not remember seeing, Plaintiff go toward the unit management office (Neal Dep. at 20; Washington Dep. at 28).

[3] Rovers are extra correctional officers who assist with problems and escort inmates outside of their housing units.  (Lynn Dep. at 43; White Dep. at 17.)

Plaintiff testified that once he arrived at the medical ward, and before he was treated, Lieutenants Henry and Lynn and Sergeant Sporango questioned him about who had stabbed him and where the stabbing had occurred.  (Bennett Dep. at 19.)  Lieutenant Henry admitted that she asked Plaintiff questions in the medical ward.  (Henry Dep. at 14-17).  However, Lieutenant Lynn denied being involved in the investigation of Plaintiff's stabbing (Lynn Dep. at 36), and Sergeant Sporango does not recall anything about the investigation (Sporango Dep. at 12).

Plaintiff's and Lieutenant Henry's accounts differ with respect to when Plaintiff received medical treatment.  Plaintiff testified that he was questioned before his medical needs were addressed by Dr. Boggio and that Dr. Boggio, who was present, never attempted to interrupt the questioning (Bennett Dep. at 20), whereas Lieutenant Henry testified that Plaintiff was receiving medical care from Dr. Boggio when she arrived at the medical unit and that she "might have" begun questioning Plaintiff while he was being treated (Henry Dep. at 16-17).  Plaintiff testified that the questioning lasted for approximately ten minutes (Bennett Dep. at 19-20), whereas Lieutenant Henry testified that the questioning lasted for approximately one or two minutes (Henry Dep. at 18).

When Dr. Boggio examined Plaintiff's wounds (Boggio Verification ¶ 3), Plaintiff told the doctor that he was having trouble breathing and was in a tremendous amount of pain (Bennett Dep. at 20).  Dr. Boggio found that Plaintiff had two puncture wounds in his left thigh, two puncture wounds in the right side of his upper back, and one puncture wound in the right trapezius area.  (Boggio Verification ¶ 3.)  Dr. Boggio's physical examination revealed that Plaintiff was awake, alert, and oriented.  (Def.'s Ex. C at 9; Defs.' Statement of Uncontested

Facts ¶ 37.)[4]   His examination further revealed that Plaintiff's neurologic examination was perfect and that Plaintiff was not in respiratory distress.  (Def.'s Ex. C at 9; Defs.' Statement of Uncontested Facts ¶ 37.)  Moreover, Plaintiff was talkative and followed commands, and there was only dried blood on his wounds.  (Def.'s Ex. C at 9; Defs.' Statement of Uncontested Facts ¶ 37.)

Dr. Boggio listened to Plaintiff's lungs and found that they were clear and did not have any rale sounds or dullness.  (Def.'s Ex. C. at 9; Defs.' Statement of Uncontested Facts ¶ 38.)  Plaintiff testified that he is not sure what treatment he received, although he does state that Dr. Boggio did not give him stitches or pain medicine and that he believes that Dr. Boggio may have cleaned the blood from his wounds and bandaged them.  (Bennett Dep. at 22, 24, 35.)  Dr. Boggio thought that Plaintiff might have a pneumothorax and ordered that he be placed in the infirmary for observation.  (Boggio Verification ¶¶ 3, 5.)  Dr. Boggio indicated in his treatment notes that Plaintiff should receive a chest x-ray to rule out the possible pneumothorax.  (Def.'s Ex. C at 9.)  Dr. Boggio also prescribed Plaintiff 600mg of Motrin to be taken twice a day for seven days.  (Id. at 18; Kalu Dep. at 20.)

Plaintiff asked to be sent to an outside hospital, but Dr. Boggio did not respond to his request.  (Bennett Dep. at 20, 22.)  Plaintiff reports that, instead, Lieutenant Lynn informed him that he would not be sent to an outside hospital unless he told Lieutenant Lynn and Sergeant Sporango who had attacked him.  (Id. at 20-21.)  Plaintiff states that he told Lieutenant Lynn that he could not identify his assailants, but she told him that if he did not disclose the identities of his attackers, he would merely be permitted to go to the infirmary, where he would remain for a "significant amount of time."  (Id. at 21.)  Lieutenant Lynn testified, however, that she could not

---

[4] Each time we cite to Defendants' Statement of Uncontested Facts, Plaintiff admitted those facts in his Responsive Statement of Material Facts.

have made this threat because neither she nor any other officer decides whether an inmate should receive a particular course of medical treatment; rather, "[t]hat's only medical's decision to make." (Lynn Dep. at 33.)  Moreover, she maintains that she was not responsible for Plaintiff's housing unit and, thus, she "wouldn't have been responsible for [the investigation surrounding his stabbing] because [she] wasn't directly involved" and "didn't respond officially to any situations in [his] building." (Id. at 36.)

C.      The Infirmary

After Plaintiff was examined by Dr. Boggio, he was locked in a cell until he could be transported to the infirmary. (Bennett Dep. at 22.)  He arrived at the infirmary at approximately 9:30 p.m. for treatment of his puncture wounds and to rule out a pneumothorax. (Id. at 22, 36.) Dr. Boggio based his "decision to send Plaintiff to the infirmary for monitoring . . . on [his] independent professional judgment as a physician" and maintains that "[n]o correctional officer . . . encouraged [him], ordered [him], threatened [him], or otherwise influenced [his] decision regarding [Plaintiff's] treatment plan." (Boggio Verification ¶ 6.)

When Plaintiff arrived at the infirmary, he was taken to the triage area, where a nurse asked him questions about his medical condition. (Bennett Dep. at 23.)  Plaintiff informed her that he was in a tremendous amount of pain, was having trouble breathing, and that it hurt every time he took a breath. (Id.)  The nurse also took Plaintiff's blood pressure and may have listened to his chest with a stethoscope. (Id. at 36-37.)  The Nursing Assessment shows that Plaintiff was awake, alert, and oriented when he arrived at the infirmary. (Def.'s Ex. C at 4.)  His admitting diagnosis was multiple stab wounds. (Id. at 5.)  His vital signs were normal; his pulse oximetry rate was 98%; his pupils were equal and reactive; and his lungs were clear. (Id. at 4, 15; Defs.' Statement of Uncontested Facts ¶¶ 40, 43.)  There was no weakness found in his upper or lower

extremities bilaterally, and he was not in distress.  (Def.'s Ex. C at 15.)  He may have received

600 milligrams of Motrin at some point while he was in the infirmary.  (Bennett Dep. at 24.)

After she examined Plaintiff, the nurse informed him that he would see a doctor the

following morning.  (Id. at 23.)  Plaintiff was then taken to an infirmary cell and locked there

until 8:00 or 8:30 a.m. the next morning, when he was seen by Dr. Winters.  (Id. at 23, 25.)

After Plaintiff informed Dr. Winters of his medical condition and complained of chest pain when

he took deep breaths, she decided to have Plaintiff's lung x-rayed.  (Id. at 25; Def.'s Ex. C at 2.)

The x-ray showed one area of Plaintiff's left upper lung lobe that was suggestive of a

pneumothorax.  (Def.'s Ex. C at 1.)  After Dr. Winters saw the results of Plaintiff's x-ray, she

informed Plaintiff that his lung was collapsing and that he would be transferred to an outside

hospital.  (Bennett Dep. at 25.)  He was admitted to Aria Health's Emergency Department at

approximately 6:40 p.m. on November 20, 2009.  (Def.'s Ex. G at 21.)  Hospital records show

that his oxygen saturation level was 100%; he had diminished breath sounds on his left side; and

the remainder of his examination was normal.  (Def.'s Ex. C at 21-22.)  Plaintiff was treated for a

small left apical lateral, and hospital staff discharged him back to CFCF on November 24, 2009,

in no respiratory distress or discomfort.  (Id. at 14; Defs.' Statement of Uncontested Facts ¶ 49.)

Plaintiff was immediately transferred to protective custody within CFCF and remained there

until January 13, 2010.  (Bennett Aff. ¶¶ 6-7.)

D.      Plaintiff's Claims

Plaintiff's Third Amended Complaint (the "TAC") alleges three violations of Plaintiff's

rights by the City of Philadelphia and its employees pursuant to 42 U.S.C. § 1983.  First, the

TAC alleges that COs Neal and Washington's "failure to provide medical attention to Plaintiff . .

. for over two hours after he was stabbed . . . and their failure to make rounds every 15 minutes

on that date constitutes a deliberate indifference to a serious medical need" in "violation of the Eighth Amendment's prohibition against cruel and unusual punishment."[5]  (TAC ¶ 42.)  Second, the TAC alleges that COs Neal and Washington's and Sergeant White's "failure to follow the policy and practice of keeping cell doors locked at all times except for exit and entry and allowing [Plaintiff's] cell to remain open . . . thereby allowing the assailants to stab [Plaintiff] constitutes a failure to protect [Plaintiff]" in violation of the Eighth Amendment.  (Id. ¶ 43.) Third, the TAC alleges that Sergeant Sporango's and Lieutenants Henry and Lynn's "threats to delay medical treatment and condition such on providing information about [Plaintiff's] assailants constitutes a deliberate indifference to a serious medical need" in violation of the Eighth Amendment.  (Id. ¶ 44.)

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law . . . ."  Id.  In ruling on a summary judgment motion, we consider "the facts and draw all reasonable

---

[5] Because Plaintiff was a pretrial detainee at the time these events occurred, the due process clause of the Fourteenth Amendment of the United States Constitution, not the Eighth Amendment, applies.  See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003).  However, courts routinely find that a pretrial detainee's Fourteenth Amendment claims of inadequate medical care and failure to protect are evaluated under the same standard as a convicted prisoner's claims under the Eighth Amendment.  See Thomas v. Cumberland Cnty., 749 F.3d 217, 223 n.4 (3d Cir. 2014) (stating that the Third Circuit applies "the same standard to a failure-to-protect claim under the Fourteenth Amendment as under the Eighth Amendment" (citation omitted)); Natale, 318 F.3d at 581-82 (applying deliberate indifference standard to pretrial detainee's denial of medical treatment claim).  As neither party has argued that we should do differently here, we apply the Eighth Amendment's deliberate indifference standard to Plaintiff's claims.

inferences in the light most favorable to the plaintiff, the party who opposed summary judgment." Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372 (2007)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

"'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'" Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)). "Evidence that is merely colorable or not significantly probative is insufficient to create a genuine issue of material fact for trial." West v. Lincoln Benefit Life Co., 509 F.3d 160, 172 (3d Cir. 2007) (citing Anderson, 477 U.S. at 248; and El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007)).

## III.   DISCUSSION

### A.   Denial of Medical Treatment Claims

The TAC alleges that COs Neal and Washington were deliberately indifferent to Plaintiff's serious medical need because Plaintiff was denied medical treatment for two hours after he was stabbed. (TAC ¶ 42.) The TAC further alleges that Lieutenants Henry and Lynn and Sergeant Sporango were deliberately indifferent to Plaintiff's serious medical need when

they interrogated him, threatened him, and delayed his medical care in the medical unit.  (Id. ¶ 44.)

To establish deliberate indifference to a serious medical need, a plaintiff must demonstrate:  (1) that his "medical needs [were] serious," and (2) "deliberate indifference on the part of prison officials."  West v. Keve, 571 F.2d 158, 161 (3d Cir. 1978) (discussing Estelle v. Gamble, 429 U.S. 97, 103-04 (1976)).  A medical need is serious if it is "'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'"  Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (quoting Pace v. Fauver, 479 F. Supp. 456, 458 (D.N.J. 1979)).  Moreover, a medical need is serious if the denial or delay of medical care results in "'unnecessary and wanton infliction of pain.'"  Id. (quoting Estelle, 429 U.S. at 104).

To establish that defendants were deliberately indifferent, a plaintiff must show that they: (1) "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety[,]" or (2) were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and actually "dr[ew] the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994). "'Deliberate indifference' . . . requires 'obduracy and wantonness,' which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk."  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986); and citing Farmer, 511 U.S. at 842).  Accordingly, negligence is not sufficient to establish deliberate indifference.  Id.  The United States Court of Appeals for the Third Circuit has stated that prison officials are deliberately indifferent when they:  "(1) know[] of a prisoner's need for medical treatment but intentionally refuse[] to provide it; (2) delay[] necessary medical treatment based on a non-medical reason; or (3) prevent[] a prisoner from receiving needed or recommended

11

medical treatment." <u>Id.</u> (citation omitted).

          1.     <u>Claims against COs Neal and Washington</u>

The TAC alleges that COs Neal and Washington were deliberately indifferent to Plaintiff's serious medical need when they denied him medical treatment after he was stabbed and failed to conduct sufficiently frequent tours on the day of the stabbing.  (TAC ¶ 42.) Defendants argue that there is insufficient evidence to establish that they acted with deliberate indifference because:  (1) Plaintiff testified that COs Neal and Washington did not become aware of the stabbing until 6:30 p.m. that evening; and (2) Plaintiff acknowledges that he began receiving medical treatment within forty-five minutes thereafter.  In response, Plaintiff argues that "[t]here is a clear issue of material fact as to the state of mind of the defendants, and a reasonable jury could find for [him]" because:  (1) Defendants made several tours of the housing unit between the time he was stabbed and the time Defendants claim to have become aware of the stabbing; (2) CO Washington spoke to Plaintiff during his tours yet asserts that he failed to notice that Plaintiff was bleeding; and (3) CO Neal testified that Plaintiff was standing when she conducted her tours and that she nevertheless failed to notice any bleeding.  (Pl.'s Resp. at 13-14.)

Defendants do not presently contest that Plaintiff's medical need was serious.  Thus, we need only determine whether Plaintiff has presented evidence creating a genuine issue of material fact as to whether COs Neal and Washington were deliberately indifferent to his serious medical need.  <u>See</u> <u>West</u>, 571 F.3d at 161.  Plaintiff testified that he was lying down on his bed after he was stabbed and that he was bleeding from all of his wounds, but not profusely. (Bennett Dep. at 12-13).  Dr. Boggio subsequently found that Plaintiff had two puncture wounds in his left thigh, two puncture wounds in the right side of his upper back, and one puncture

wound in the right trapezius area.  (Boggio Verification ¶ 3.)  He further found that there was dried blood on Plaintiff's wounds, and that Plaintiff had bruises on his face and upper chest.  (Id. ¶ 8; Def.'s Ex. G at 2.)  In addition, Plaintiff's admitting diagnosis at the infirmary was multiple stab wounds (Def.'s Ex. C at 5), and what appears to be blood is clearly visible in the photographs of Plaintiff's injuries (Pl.'s Ex. Q).

The evidence thus shows that, in the aftermath of the attack, Plaintiff had bruises and bloody wounds on both his front and his back.  (See id.; Boggio Verification ¶¶ 3, 8.)  Given Plaintiff's condition, if Plaintiff was, as CO Washington has claimed, lying down with his back to CO Washington when CO Washington made his rounds, a reasonable jury could infer that CO Washington must have seen Plaintiff's wounds.  Similarly, if Plaintiff was, as CO Neal has claimed, standing in the doorway of his cell when CO Neal made her rounds, a reasonable jury could infer that CO Neal must have seen Plaintiff's injuries.  Accordingly, we conclude that there is record evidence that creates a genuine issue of material fact as to whether Defendants, at different points in time between 4:30 p.m. and 5:00 p.m., became aware of facts from which they must have, necessarily, drawn an inference that a substantial risk of serious harm existed.  See Farmer, 511 U.S. at 837.  As there is also evidence that Plaintiff was not transported to the medical unit until 7:15 p.m., we conclude that Plaintiff has presented evidence that creates a genuine issue of material fact as to whether COs Neal and Washington were deliberately indifferent to his serious medical need in violation of § 1983.  We therefore deny Defendants' Motion as to these claims.

2.      Claims against Lieutenants Henry and Lynn and Sergeant Sporango

The TAC alleges that Lieutenants Henry and Lynn and Sergeant Sporango were deliberately indifferent to Plaintiff's serious medical need when they interrogated him,

threatened him, and delayed his medical care in the medical unit.[6]  (TAC ¶ 44.)  Defendants argue that summary judgment should be granted in favor of Lieutenants Henry and Lynn and Sergeant Sporango because:  (1) Plaintiff "has adduced no record evidence that these threats occurred, other than his own testimony[;]" and (2) "Plaintiff has adduced no evidence that these alleged threats caused [PHS's] staff to refuse to send [him] to the hospital, or in any way caused his medical care to be delayed."  (Defs.' Mem. at 10.)

As a preliminary matter, it is not, as Defendants argue, fatal to Plaintiff's claim that Plaintiff's testimony is the only evidence that there was a threat, and that Defendants' deposition testimony contradicts Plaintiff's testimony.  Indeed, credibility issues cannot be resolved on summary judgment and should instead be resolved by the factfinder, and because Plaintiff is the nonmoving party, we must accept his testimony as true for the purposes of determining whether there is a genuine issue of material fact.  See, e.g., Suarez v. City of Bayonne, 566 F. App'x 181, 186 (3d Cir. 2014) ("The District Court's grant of summary judgment amounted to a determination that Suarez's deposition testimony was not credible and that the evidence in the Detectives' favor outweighed that in favor of Suarez, two determinations that it was not permitted to make at summary judgment.").  We therefore conclude that Plaintiff's testimony that he was threatened is sufficient to create a genuine issue of material fact as to whether the threat occurred, and we will not grant summary judgment in Defendants' favor solely because

---

[6] The TAC asserts that "Defendants Lt. Lynn, Sgt. Sporango and Lt. Henry's threats to delay medical treatment and condition such on providing information about Bennett's assailants constitute[] a deliberate indifference to a serious medical need . . . ."  (TAC ¶ 44.)  We construe this cause of action to include the questioning of Plaintiff in the medical unit because the TAC includes an allegation that Plaintiff "was questioned and threatened by" these Defendants before he received any medical treatment.  (See id. ¶ 4.)  We also note that there is no evidence that anyone other than Lieutenant Lynn threatened Plaintiff, but there is evidence that all three Defendants questioned Plaintiff in the medical unit before he received medical care.  (See Bennett Dep. at 19.)

other evidence contradicts his testimony.

With respect to Defendants' argument as to causation, "[i]t is axiomatic that '[a] § 1983 action . . . employs the principle of proximate causation.'" Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000) (quoting Townes v. City of N.Y., 176 F.3d 138, 149 (2d Cir. 1999)). To establish proximate causation, "a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the [defendant's actions] and the specific deprivation of constitutional rights at issue." Id. (internal quotation omitted).

Plaintiff argues that there is sufficient evidence in the record to create a genuine issue of material fact regarding whether Defendants' conduct in questioning and threatening him delayed his medical treatment, thereby exhibiting deliberate indifference to his serious medical need. He specifically maintains that his medical treatment was delayed when Lieutenants Henry and Lynn and Sergeant Sporango interrogated and threatened him in the medical unit.[7] In fact, there is record evidence that Lieutenants Henry and Lynn and Sergeant Sporango questioned Plaintiff in the medical ward about who had stabbed him and where the stabbing had occurred. (Bennett Dep. at 19.) Moreover, Plaintiff testified that he was questioned for approximately ten minutes before he was treated by Dr. Boggio and that Dr. Boggio, who was present, did not attempt to interrupt the questioning. (Id. at 19-20.)

Plaintiff further testified that Lieutenant Lynn informed him that she did not believe he was telling the truth when he said that he did not know who had stabbed him and that Sergeant

---

[7] Plaintiff also argues that his medical treatment was delayed when: (1) he was questioned immediately after being taken out of his cell; (2) he was questioned in the Sally port; and (3) he was questioned in the unit management office. However, this questioning was conducted by Sergeant White, who is not a Defendant to this deliberate indifference claim. (See TAC ¶ 44), and CO Edwards, who is not even a Defendant in this case. Accordingly, we do not consider these other events in deciding whether Plaintiff has established a genuine issue of material fact in connection with his claim that Lieutenants Henry and Lynn and Sergeant Sporango were deliberately indifferent to his serious medical need.

Sporango told him that he needed to let them know exactly what had happened or they were going to get in trouble for the stabbing. (Id. at 20-21.) According to Plaintiff, when he stated that he could not identify his assailants, Lieutenant Lynn threatened that he would not be permitted to go to an outside hospital unless he told them who had stabbed him, and that if he did not disclose the identities of his attackers, he would merely be permitted to go to the infirmary, where he would remain for a "significant amount of time." (Id. at 21.) In the end, Plaintiff was not sent to an outside hospital until approximately 6:40 p.m. on November 20, 2009 -- more than twenty-four hours after he was stabbed. (Def.'s Ex. G at 21.) While Defendants dispute various aspects of this account, we conclude that a reasonable jury, viewing Plaintiff's evidence in the light most favorable to Plaintiff, could infer that Defendants' questioning and threats considerably delayed Plaintiff's transport to an outside hospital. See Hedges, 204 F.3d at 121 (stating that to establish proximate causation, "a plaintiff must demonstrate a 'plausible nexus' . . . between the [defendant's actions] and the specific deprivation of constitutional rights at issue" (internal quotation omitted)).

We therefore reject Defendants' argument that Plaintiff has failed to present evidence to support a conclusion that their conduct caused his medical care to be delayed, and we conclude, to the contrary, that Plaintiff has met his burden of producing evidence that creates a genuine issue of material fact with respect to whether Lieutenants Henry and Lynn and Sergeant Sporago were deliberately indifferent to his serious medical need. We therefore deny Defendants' Motion as to Plaintiff's § 1983 claim that Lieutenants Henry and Lynn and Sergeant Sporango caused such delay, in deliberate indifference to his serious medical need.

B.      Failure to Protect Claims against COs Neal and Washington and Sergeant White

The TAC alleges that COs Neal and Washington's and Sergeant White's "failure to follow the policy and practice of keeping cell doors locked at all times except for exit and entry and allowing [Plaintiff's] cell to remain open . . . thereby allowing the assailants to stab [Plaintiff] constitutes a failure to protect [Plaintiff]" in violation of the Eighth Amendment. (TAC ¶ 43.) Prison officials have "a duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833 (alteration in original) (quotation and citation omitted); see also Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997) (citation omitted). However, not "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834. To prove a failure to protect claim against a prison official, an inmate must show that: "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm." Bistrian v. Levi, 696 F.3d 352, 367 (3d Cir. 2012) (citing Farmer, 511 U.S. at 834; and Hamilton, 117 F.3d at 746).

"'Deliberate indifference' in this context is a subjective standard: 'the prison official-defendant[s] must actually have known or been aware of the excessive risk to inmate safety.'" Id. (quoting Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001)). "A plaintiff can . . . prove an official's actual knowledge of a substantial risk to his safety 'in the usual ways, including inference from circumstantial evidence.'"[8] Id. at 367 (quoting Farmer, 511 U.S. at 842). That is, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the [substantial] risk was obvious." Farmer, 511 U.S. at 842 (citation omitted).

_____

[8] In this context, courts appear to use the phrases "excessive risk" and "substantial risk" interchangeably. See, e.g., Bistrian, 696 F.3d at 367.

Consequently, liability for failure to protect "may not be predicated on exposure to <u>any</u> risk of serious harm; the risk must be 'substantial.'" <u>Betts v. New Castle Youth Dev. Cntr.</u>, 621 F.3d 249, 258 (3d Cir. 2010) (emphasis in original) (citing <u>Helling v. McKinney</u>, 509 U.S. 25, 33 (1993)); <u>see also id.</u> at 257 ("The mere possibility that an injury may result from an activity does not mean that there is a 'substantial risk' of the injury occurring." (citing <u>Baze v. Rees</u>, 553 U.S. 35, 50 (2008))).

      1.   <u>Deliberate indifference</u>

Defendants Neal, Washington, and White argue that there is no genuine issue of material fact as to whether they acted with deliberate indifference by leaving Plaintiff's cell door unlocked, and that, based on the record evidence, they are entitled to judgment as a matter of law on Plaintiff's failure to protect claims. Specifically, they argue that Plaintiff has failed to produce evidence that any of them knew of and disregarded a substantial risk to his safety.

Plaintiff contends that the record evidence supports a conclusion that COs Neal and Washington and Sergeant White had actual knowledge of a threat of serious harm to him because there is evidence that they knew both that his cell door was unlocked and that unlocked cell doors pose an obvious, substantial risk to inmate safety. However, while Plaintiff asserts that the record supports a conclusion that these Defendants knew of an obvious, substantial risk to his safety, Plaintiff cites only to evidence that these officials were trained in prison policies requiring that cell doors be locked for safety reasons. (<u>See</u> Neal Dep. at 9; Washington Dep. at 7-8; White Dep. at 10; Pl.'s Ex. J, Phila. Prisons Policies & Procedures, Policy 3.D.3 at 5 (requiring that "[a]ll doors to cells/rooms . . . be locked except when they are open for entry and exit"); Pl.'s Ex. K, Phila. Prisons Policies & Procedures, Policy 3.D.2 at 3 (requiring that "[l]ocking mechanisms . . . be checked at the beginning, end, and periodically during the shift by the security staff

assigned to the housing unit").)  While such evidence may support an inference that COs Neal and Washington and Sergeant White were aware of some risk associated with unlocked cell doors, it does not, without more, support an inference that they knew of an obvious, substantial risk that an inmate would be harmed in an inmate-on-inmate attack occurring within an unlocked prison cell, much less that Plaintiff was at risk of such an attack.[9]

"Whether unlocked cell doors pose an unconstitutional risk to detainees . . . is always a factual question dependent on the totality of the specific prison's circumstances and the prison officials' awareness of the risk."  Walton v. Dawson, 752 F.3d 1109, 1120 (8th Cir. 2014); see also id. ("There is no sweeping constitutional rule that every cell in every prison must be locked as soon as the sun sets.").  Here, Plaintiff does not present evidence that there were any prior inmate-on-inmate attacks in an unlocked cell at CFCF, or even that CFCF was a particularly violent or dangerous facility.  See Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir. 1985) (indicating that plaintiffs cannot prove prison officials' deliberate indifference to an obvious, substantial risk of harm by "pointing to a single incident or isolated incidents").  Plaintiff also fails to present any evidence that he, in particular, was at risk of being attacked.  See Jones v. Beard, 145 F. App'x 743, 745-46 (3d Cir. 2005) (concluding that there was no deliberate indifference where record was "devoid of evidence establishing that [plaintiff] articulated specific threats of serious

---

[9] Notably, even if these Defendants may have violated prison policies by failing to ensure that Plaintiff's cell door was locked, a violation of an internal policy does not automatically rise to the level of a constitutional violation.  See Edwards v. Baer, 863 F.2d 606, 608 (8th Cir. 1988) ("[P]olice department guidelines do not create a constitutional right."); Rathy v. Wetzel, Civ. A. No. 13-72, 2014 WL 4104946, at *11 (W.D. Pa. Aug. 19, 2014) (finding that defendants, who were employees of the Pennsylvania Department of Corrections, were not liable under § 1983 for violations of Department of Corrections policies because "state agency guidelines do not, in and of themselves, create a right, and do not have the force of law" and, thus, "a violation of internal policy does not automatically rise to the level of a constitutional violation" (citing Mercy Catholic Med. Ctr. v. Thompson, 380 F.3d 142, 154 (3d Cir. 2004) (remaining citations omitted)).

harm, or that he made multiple complaints about [inmate who attacked him] to any one guard");
see also Tabb v. Hannah, Civ. A. No. 10-1122, 2012 WL 3113856, at *5 (M.D. Pa. July 30,
2012) (concluding that there was no obvious, substantial risk of harm, and thus no deliberate
indifference, when "[t]here [was] nothing . . . to suggest that the[] defendants were aware of any
specific inmate threatening [plaintiff] or posing a risk to his safety").  In fact, Plaintiff testified at
his deposition that he had no reason to fear that he would be stabbed and that he did not inform
any guards that he thought he would be stabbed.  (Bennett Dep. at 10-11.)

        We conclude, accordingly, that there is insufficient record evidence to establish that
Plaintiff's unlocked cell door created a substantial risk of inmate-on-inmate attack, much less
that there was such an obvious, substantial risk that a jury could infer that COs Neal and
Washington and Sergeant White must have known of it.  See Walker v. Tennessee, No. 98-6586,
2000 WL 32057, at *2 (6th Cir. Jan. 7, 2000) (concluding that complaint did not adequately
allege deliberate indifference when it alleged that prison officials knew inmate's door was
unlocked, but failed to allege any other facts demonstrating that the officials were aware that the
inmate was at risk of being assaulted).  Rather, it is clear from the record that any risk of such an
attack was purely speculative, and a purely speculative risk cannot give rise to deliberate
indifference.  See Bistrian, 696 F.3d at 371 (concluding that the risk that a violent inmate might
attack another inmate in a locked recreation pen for an unknown reason was speculative, and
thus could not support a claim of deliberate indifference).  Because Plaintiff has merely adduced
evidence of a speculative risk of serious harm, he has failed to meet his burden of producing
evidence that creates a genuine issue of material fact as to whether COs Neal and Washington
and Sergeant White knew of and were deliberately indifferent to an obvious, substantial risk to
inmate safety, in violation of § 1983, when they left Plaintiff's cell door unlocked.  We therefore

conclude that Defendants Neal, Washington, and White are entitled to the entry of judgment as a matter of law with respect to Plaintiff's failure to protect claims on this basis.

        2.    <u>Supervisory liability</u>

Defendants further argue that Plaintiff's claim against Sergeant White is grounded on supervisory liability and that "Plaintiff has adduced no competent evidence to indicate that . . . [Sergeant] White . . . knew his cell door was unlocked or bore any responsibility to ensure it was." (Defs.' Mem. at 11.)  The Third Circuit has explained that an individual with supervisory authority may be liable for deliberate indifference to a violation of constitutional rights in two situations.  First, "policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'"  <u>A.M. v. Luzerne Cnty. Juvenile Det. Ctr.</u>, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original) (quoting <u>Stoneking v. Bradford Area Sch. Dist.</u>, 882 F.2d 720, 725 (3d Cir. 1989)).  Second, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations."  <u>Id.</u> (citing <u>Baker v. Monroe Twp.</u>, 50 F.3d 1186, 1190-91 (3d Cir. 1995)).  "[A]ctual knowledge can be inferred from circumstances other than actual sight." <u>Baker</u>, 50 F.3d at 1194.  Furthermore, "[w]here a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in . . . the subordinate's conduct."  <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1294 (3d Cir. 1997), <u>abrogated on other grounds by</u> <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 76-78 (2007).

There is no evidence in the record to support a claim against Sergeant White under either situation in which liability may be imposed on a supervisor.  With respect to the first situation, there is no evidence that Sergeant White was a policymaker or that he "established and maintained a policy, practice or custom" of keeping inmates' cells unlocked.  See A.M., 372 F.3d at 586.  With respect to the second situation, Plaintiff has adduced no evidence that Sergeant White himself left Plaintiff's cell unlocked, directed others to unlock the cell door, or "as the person in charge, had knowledge of and acquiesced in" COs Neal and Washington's failure to secure Plaintiff's cell door.  See id.  We conclude, accordingly, that Plaintiff has failed to meet his burden of producing evidence that creates a genuine issue of material fact as to Sergeant White's supervisory liability for Plaintiff's cell being left unlocked and the subsequent stabbing.

In light of the foregoing, we conclude that Plaintiff has failed to meet his burden of producing evidence that creates a genuine issue of material fact as to whether COs Neal and Washington and Sergeant White are liable under § 1983 for failing to protect him.  We therefore grant Defendants' Motion as to Plaintiff's failure to protect claims against COs Neal and Washington and Sergeant White.

## IV.     CONCLUSION

For the foregoing reasons, we grant Defendants' Motion for Summary Judgment as to Plaintiff's claims that COs Neal and Washington and Sergeant White failed to protect him when his cell was left unlocked, in violation of § 1983, because Plaintiff has failed to meet his burden of producing evidence to support these claims.  At the same time, we deny Defendants' Motion

as to Plaintiff's § 1983 claims that COs Neal and Washington, Lieutenants Henry and Lynn, and Sergeant Sporango were deliberately indifferent to his serious medical need.   An appropriate Order follows.

BY THE COURT:


/s/ John R. Padova
John R. Padova, J.