IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHON M. BENNETT | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PRISON HEALTH SERVICES INC., | : | NO. 11-176 |
| ET AL. | : | |

**MEMORANDUM**

**Padova, J.**                                                                                          **March 19, 2015**

Plaintiff Stephon M. Bennett brings this action against Defendant Prison Health Services, Inc. ("PHS") and others, pursuant to 42 U.S.C. § 1983, alleging violations of his civil rights arising out of a prison assault in his unlocked cell and subsequent medical care. Specifically, he brings a Monell claim asserting that PHS was deliberately indifferent to the obvious risk of constitutional violations flowing from a PHS practice of allowing prison officials to delay medical treatment for injured inmates. PHS has moved for summary judgment in its favor under Federal Rule of Civil Procedure 56(a). For the following reasons, we grant Defendant's Motion.

**I.     BACKGROUND**

On November 19, 2009, Plaintiff was an inmate at the Curran Fromhold Correctional Facility ("CFCF"), which is part of the Philadelphia Prison System ("PPS"). (Bennett Dep. at 6, 8.) At 4:30 p.m., he was attacked by a number of unknown assailants who entered his cell, which was unlocked. (Id. at 10-11.) Plaintiff was punched repeatedly and suffered six stab wounds. (Id. at 11-12.)

      A.     Actions of Correctional Officers on Plaintiff's Housing Unit

At some point between 5:50 p.m. and 6:35 p.m., Correctional Officers ("COs") Clifton Washington and/or Sharon Neal, who were on duty in Plaintiff's housing unit, discovered that

Plaintiff had been stabbed. (Id. at 13-14; Pl.'s Exs. O, P.) CO Neal immediately called Sergeant Malachi White, who, in turn, called the medical unit. (Neal Dep. at 16; White Dep. at 23-24, 31.)

Less than a minute after CO Washington was informed of the stabbing, either he or Sergeant White took Plaintiff out of his cell to the Sally port, a controlled entryway into and out of Plaintiff's housing unit. (Neal Dep. at 16-17; Washington Dep. at 32; Pl.'s Exs. O, P.) In the Sally port, Sergeant White asked Plaintiff what had happened and told Plaintiff that he would be sent to the medical unit. (Bennett Dep. at 14-15; White Dep. at 24-27.) Plaintiff informed Sergeant White that the stabbing had "occurred inside [his] unlocked multipurpose room" and that "a number of inmates" had stabbed him. (Bennett Dep. at 15.) He also informed Sergeant White that he was in a great deal of pain and was experiencing shortness of breath. (Id. at 18.) According to CO Washington, he, Plaintiff, and Sergeant White were only in the Sally port for a matter of seconds before Plaintiff was taken to the medical unit. (Washington Dep. at 27-28.) Sergeant White testified that Plaintiff was taken to the medical unit "right away" once he arrived on the scene. (White Dep. at 32.)

Plaintiff testified that before he was taken to the medical unit, he was taken to the unit management area, where he was questioned by a correctional officer named Edwards for approximately ten minutes. (Bennett Dep. at 15, 18.) Plaintiff reports that CO Edwards asked him who had stabbed him, where it occurred, what the assailants looked like, and what their names were. (Id. at 15.) Plaintiff informed her that he did not know who had stabbed him. (Id. at 16.) According to Plaintiff, he was then left unsupervised in the unit management area for twenty or twenty-five minutes before he was taken to the medical unit. (Id. at 17-18.)

B.     The Medical Unit

One or two rovers took Plaintiff to the medical unit at approximately 7:15 p.m. or 7:30 p.m. (Bennett Dep. at 14, 18; Neal Dep. at 18; Washington Dep. at 28; White Dep. at 27; Boggio Verification ¶ 3.)  Plaintiff testified that once he arrived at the medical unit, and before he was treated, Lieutenants Elizabeth Henry and Danielle Lynn and Sergeant Michael Sporango questioned him about the stabbing.  (Bennett Dep. at 19.)  Lieutenant Henry admitted that she asked Plaintiff questions in the medical ward.  (Henry Dep. at 14-17).  In contrast, Lieutenant Lynn denied being involved in the investigation of Plaintiff's stabbing (Lynn Dep. at 36), and Sergeant Sporango does not recall anything about the investigation (Sporango Dep. at 12).

Plaintiff's and Lieutenant Henry's accounts differ with respect to when Plaintiff received medical treatment.  Plaintiff testified that he was questioned before his medical needs were addressed by PHS employee Dr. Jose Boggio and that Dr. Boggio, who was present, never attempted to interrupt the questioning (Bennett Dep. at 20; Boggio Verification ¶ 6), whereas Lieutenant Henry testified that Plaintiff was receiving medical care from Dr. Boggio when she arrived at the medical unit and that she "might have" begun questioning Plaintiff while he was being treated (Henry Dep. at 16-17).  Plaintiff testified that the questioning lasted for approximately ten minutes (Bennett Dep. at 19-20), whereas Lieutenant Henry testified that the questioning lasted for approximately one or two minutes (Henry Dep. at 18).

Dr. Boggio examined Plaintiff's wounds and found that Plaintiff had two puncture wounds in his left thigh, two puncture wounds in the right side of his upper back, and one puncture wound in the right trapezius area. (Boggio Verification ¶ 3.)  Plaintiff asked to be sent to an outside hospital, but Dr. Boggio did not respond to his request.  (Bennett Dep. at 20, 22.) Plaintiff reports that, instead, Lieutenant Lynn informed him that he would not be sent to an

3

outside hospital unless he told Lieutenant Lynn and Sergeant Sporango who had attacked him. (Id. at 20-21.) Plaintiff states that he told Lieutenant Lynn that he could not identify his assailants, but she told him that if he did not disclose the identities of his attackers, he would merely be permitted to go to the infirmary, where he would remain for a "significant amount of time." (Id. at 21.) Lieutenant Lynn testified, however, that she could not have made this threat because neither she nor any other officer decides whether an inmate should receive a particular course of medical treatment; rather, "[t]hat's only medical's decision to make." (Lynn Dep. at 33.) Moreover, she maintains that she was not responsible for Plaintiff's housing unit and, thus, she "wouldn't have been responsible for [the investigation surrounding his stabbing] because [she] wasn't directly involved" and "didn't respond officially to any situations in [Plaintiff's] building." (Id. at 36.)

    C.    The Infirmary

After Plaintiff was examined by Dr. Boggio, he was locked in a cell until he could be transported to the infirmary. (Bennett Dep. at 22.) He arrived at the infirmary at approximately 9:30 p.m. for treatment of his puncture wounds and to rule out a pneumothorax. (Id. at 22, 36.) Dr. Boggio based his "decision to send Plaintiff to the infirmary for monitoring . . . on [his] independent professional judgment as a physician" and maintains that "[n]o correctional officer . . . encouraged [him], ordered [him], threatened [him], or otherwise influenced [his] decision regarding [Plaintiff's] treatment plan." (Boggio Verification ¶ 6.)

Plaintiff's admitting diagnosis at the infirmary was multiple stab wounds. (Def.'s Ex. C at 5.) He was examined by a nurse who informed him that he would see a doctor the following morning. (Bennett Dep. at 23.) Plaintiff was then taken to an infirmary cell and locked there until 8:00 or 8:30 a.m. the next morning, when he was seen by Dr. Winters. (Id. at 23, 25.)

After Plaintiff informed Dr. Winters of his medical condition and complained of chest pain when he took deep breaths, she decided to have Plaintiff's lung x-rayed. (Id. at 25; Def.'s Ex. C at 2.) The x-ray showed one area of Plaintiff's left upper lung lobe that was suggestive of a pneumothorax. (Def.'s Ex. C at 1.) After Dr. Winters saw the results of Plaintiff's x-ray, she informed Plaintiff that his lung was collapsing and that he would be transferred to an outside hospital. (Bennett Dep. at 25.) He was admitted to Aria Health's Emergency Department at approximately 6:40 p.m. on November 20, 2009. (Def.'s Ex. G at 21.) Plaintiff was treated for a small left apical lateral pneumothorax, and the hospital staff discharged him back to CFCF on November 24, 2009, in no respiratory distress or discomfort. (Def.'s Ex. C at 14; Defs.' Statement of Uncontested Facts ¶ 49; Pl.'s Responsive Statement of Material Facts ¶ 49.) Plaintiff was immediately transferred to protective custody within CFCF and remained there until January 13, 2010. (Bennett Aff. ¶¶ 6-7.)

## II.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law . . . ." Id. In ruling on a summary judgment motion, we consider "the facts and draw all reasonable inferences in the light most favorable to the plaintiff, the party who opposed summary judgment." Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372 (2007)).

"[A] party seeking summary judgment always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

"'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'" Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)). "Evidence that is merely colorable or not significantly probative is insufficient to create a genuine issue of material fact for trial." West v. Lincoln Benefit Life Co., 509 F.3d 160, 172 (3d Cir. 2007) (citing Anderson, 477 U.S. at 248; and El v. Se. Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007)).

## III.    DISCUSSION

### A.    Exhaustion

PHS argues that it is entitled to summary judgment because Plaintiff has failed to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act of 1995 ("PLRA" or the "Act"), 42 U.S.C. § 1997e *et seq.* The PLRA requires an inmate to exhaust his administrative remedies before bringing a lawsuit pursuant to 42 U.S.C. § 1983. Specifically, the Act provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The procedural requirements that inmates must follow are those set forth

in their prisons' administrative remedy process.  Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004); see also 42 U.S.C. § 1997e(a).  Notably, inmates need not exhaust all possible administrative remedies before commencing a suit in federal court; rather, they need only exhaust those remedies that are available to them.  Brown v. Croak, 312 F.3d 109, 111 (3d Cir. 2002) (citations omitted).  In the context of the PLRA, "'[a]vailable' means 'capable of use; at hand.'"  Id. at 113 (citing Webster's II, New Riverside Univ. Dictionary 141 (1994)).  "Remedies that are not reasonably communicated to inmates may be considered unavailable for exhaustion purposes."  Small v. Camden Cnty., 728 F.3d 265, 271 (3d Cir. 2013) (citing Brown, 312 F.3d at 113; Dillon v. Rogers, 596 F.3d 260, 268 (5th Cir. 2010); and Goebert v. Lee Cnty., 510 F.3d 1312, 1323 (11th Cir. 2007)).

"Whether there is an available administrative remedy is a question of law for the court to decide . . . ."  In re Bayside Prison Litig., 351 F. App'x 679, 681 (3d Cir. 2009) (citing Brown, 312 F.3d at 111; and Snider v. Melindez, 199 F.3d 108, 113-14 (2d Cir. 1999)).  Because exhaustion of administrative remedies is an affirmative defense, the burden of proving the plaintiff's failure to exhaust his claims rests with the defendant.  Small, 728 F.3d at 268-69 (citing Jones v. Bock, 549 U.S. 199, 212, 216-17 (2007); and Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002)).

The PPS has an internal grievance process available to inmates who seek redress for certain injuries they sustain while incarcerated.  (Def.'s Ex. K, Prisons Policies & Procedures, Policy 3.F.10 ("Policy 3.F.10") at 1.)  "These grievance procedures are available to address any element of prison conditions [that] the inmate alleges violated [his] constitutional rights; this includes . . . the denial or inadequacy of medical treatment."  Wilson v. Burke, Civ. A. No. 09-2961, 2012 WL 4108926, at *5 (E.D. Pa. Sept. 18, 2012) (citing Policy 3.F.10 at 2).  Since

Plaintiff's claim concerns the denial or inadequacy of medical treatment, those grievance procedures apply in this case.  See id.

The PPS Prisoner Handbook states that "[a] complete set of the inmate grievance procedures will be posted and Inmate Grievance forms will be available in all housing areas, Restorative and Transitional Services offices, and prison Law Libraries."  (Def.'s Ex. J, Prisoner Handbook of the PPS ("Prisoner Handbook") at 30.)  The Handbook further provides that if a grievance form is not available, the inmate "may write [his] grievance or complaint on a plain piece of paper."  (Id.)  Prison staff members are supposed to be available to assist inmates in filling out grievance forms.  (Id.)  Additionally, Policy 3.F.10 states that "[n]o staff member may impede an inmate's filing of a grievance."  (Policy 3.F.10 at 4.)

PHS argues that Plaintiff failed to exhaust his administrative remedies because he did not file a grievance form and could have written his grievance on a plain piece of paper.  PHS does not, however, specifically address whether these remedies were "reasonably communicated," and therefore "available," to Plaintiff.  See Small, 728 F.3d at 271 (citations omitted).  With respect to this issue, it is undisputed that Plaintiff never submitted a written complaint about the attack and how the prison officials and PHS handled it.  (Bennett Dep. at 28.)  At the same time, Plaintiff avers in his Affidavit that he was never given a copy of the Handbook while he was incarcerated at CFCF (Bennett Aff. ¶ 2), and Defendant presents no evidence to the contrary.  In addition, it is undisputed that Plaintiff "repeatedly sought out and asked for grievance forms and was ignored, told there were none available, or told that a grievance form would be made available to [him] and never received a form."  (Bennett Aff. ¶ 8; see also Bennett Dep. at 27-28.)  Indeed, the evidence is that from November 25, 2009 to November 28, 2009, Plaintiff continually asked COs Welsh and Williams for a grievance form (Bennett Aff. ¶¶ 9-10; Bennett

Dep. at 28), and he repeated such requests to other PPS employees, including Sergeant Anderson, until January 13, 2010, when he was transferred to another prison (Bennett Aff. ¶ 13; Bennett Dep. at 28). On December 1, 2009, Plaintiff informed Major May that he had requested a grievance form and that none had been made available to him. (Bennett Aff. ¶ 16; Bennett Dep. at 27.) Major May asked Plaintiff if he wanted a grievance form to file a complaint concerning the stabbing, and Plaintiff responded that he "needed a grievance form because of the way the officers had handled the situation." (Bennett Aff. ¶¶ 18-19; see also Bennett Dep. at 27-28.) Major May informed Plaintiff that a grievance form would be made available to him, but Plaintiff never received one from any prison official while he was incarcerated at CFCF. (Bennett Aff. ¶¶ 11-12, 14, 20-21; Bennett Dep. at 28.)

These undisputed facts of record indicate that Plaintiff's administrative remedies were not "reasonably communicated" to him, and that they were therefore "unavailable." See Small, 728 F.3d at 271 (citations omitted). Indeed, the evidence shows that Plaintiff was unaware that he was able to write his grievance on a plain piece of paper and that he believed that he had proceeded through all of the avenues he could in order to file a grievance while he was incarcerated at CFCF. (See Bennett Dep. at 26-28.) Although Plaintiff repeatedly attempted to obtain a grievance form from correctional officers, sergeants, lieutenants, and even a major, there is no evidence that anyone ever informed Plaintiff that he could simply file his grievance on a plain piece of paper. In fact, Plaintiff was led to believe by all of these prison officials that he needed to file his complaint on an official grievance form and could not file a grievance on some other piece of paper (Bennett Aff. ¶¶ 8, 20; Bennett Dep. at 26-28). See Brown, 312 F.3d at 111-12 (concluding that defendants had "not met their burden of proving the affirmative defense of failure to exhaust remedies" where plaintiff had complained informally to security officials and

9

was given misinformation about filing a grievance). Furthermore, while the Prisoner Handbook states that prison staff members are available to assist inmates in filling out their grievances, there is no evidence that the staff members Plaintiff approached for assistance actually provided any assistance (see Prisoner Handbook at 30). See Labounty v. Johnson, 253 F. Supp. 2d 496, 502-04 (W.D.N.Y. 2003) ("Where an inmate alleges that his attempts to comply with the [grievance] process . . . were hampered by the defendants' conduct, dismissal [on the basis of failure to exhaust administrative remedies] is not warranted" (citations omitted)).

There is also no record evidence that the grievance procedures were communicated to Plaintiff or made available in other ways. For instance, there is no evidence that Plaintiff's orientation at CFCF "include[d] an explanation of the grievance procedures and [allowed] for questions and answers" (see Policy 3.F.10 at 4). Moreover, there is no record evidence suggesting that the inmate grievance procedures were actually posted within CFCF, or that Plaintiff could have obtained a grievance form in all housing areas, including the administrative segregation unit he was housed in from November 25, 2009 until January 13, 2010; the Restorative and Transitional Services offices; and the prison law libraries. (See Bennett Aff. ¶¶ 6-7; Prisoner Handbook at 30.)

We therefore conclude that the remedies that CFCF provides to prisoners were not "reasonably communicated" and therefore "available" to Plaintiff within the meaning of "available" in the PHRA because PHS has presented no evidence that: (1) he received the Prisoner Handbook; (2) he received grievance forms when he asked for them; (3) prison officers informed him that he could file his grievance on a plain piece of paper; (4) the grievance procedures -- and the ways to file grievances -- were explained to him at his prison orientation; (5) grievance forms were available to him in any housing areas, Restorative and Transitional

Services offices, and prison law libraries; or (6) he was otherwise aware that he could file his grievance on a plain piece of paper. We further conclude, accordingly, that PHS has not met its burden of establishing the affirmative defense that Plaintiff did not exhaust his available administrative remedies. See Kaba v. Stepp, 458 F.3d 678, 685-86 (7th Cir. 2006) (concluding that district court erred in granting summary judgment for defendants on the basis that plaintiff had failed to exhaust his administrative remedies because grievance system was, in effect, "unavailable" to plaintiff since plaintiff had, *inter alia*, "attempted to file grievances up to and through the [prison] attack, but . . . was denied forms").

      B.      42 U.S.C. § 1983 Claim

Plaintiff's Monell claim pursuant to 42 U.S.C. § 1983 asserts that PHS was deliberately indifferent to an obvious risk of a constitutional violation resulting from an existing practice at PHS of allowing prison officials to delay medical treatment for injured inmates. Section 1983 provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To obtain relief under § 1983, "a plaintiff must demonstrate [that] the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States." Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citations omitted). It is well-settled that a municipal entity may only be liable under § 1983 when it implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 694 (1978). "The same standard applies to a private corporation [like PHS] . . . that is

11

acting under color of state law." Thomas v. Zinkel, 155 F. Supp. 2d 408, 412 (E.D. Pa. 2001) (citation omitted); see also Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003) (recognizing that "[i]n order for PHS to be liable, [the plaintiff] must provide evidence that there was a relevant PHS policy or custom").

"[A]bsent the conscious decision or deliberate indifference of some natural person, a municipality, as an abstract entity, cannot be deemed to have engaged in a constitutional violation by virtue of a policy [or] a custom," Simmons v. City of Philadelphia, 947 F.2d 1042, 1063 (3d Cir. 1991), and it is the plaintiff's burden "'to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom.'" B.S. v. Somerset Cnty., 704 F.3d 250, 274-75 (3d Cir. 2013) (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990)).  A policymaker is an official with "final, unreviewable discretion to make a decision or take an action." Andrews, 895 F.2d at 1481 (discussing City of St. Louis v. Praprotnik, 485 U.S. 112, 142 (1988)); see also Hill v. Borough of Kutztown, 455 F.3d 225, 245-46 (3d Cir. 2006) (citing cases). PHS can therefore only be liable under § 1983 pursuant to Monell if a natural person who is a final decisionmaker with the "'authority to establish municipal policy'" issued a policy or acquiesced in a custom that led to a deprivation of Plaintiff's constitutional rights. See Mulholland v. Gov't Cnty. of Berks, 706 F.3d 227, 237 (3d Cir. 2013) (quoting Andrews, 895 F.2d at 1469). Determining whether an employee has final policymaking authority is a question of law for the judge to decide. B.S., 704 F.3d at 275 n.36 (citing Andrews, 895 F.2d at 1481).

Defendant argues that the Court should grant summary judgment in its favor because Plaintiff has failed to identify any individual as PHS's final policymaker. Plaintiff has not responded to this argument, and we have found nothing in the record that identifies PHS's final

12

policymaker. We conclude, accordingly, that Plaintiff has failed to meet his burden of producing evidence establishing the identity of PHS's final policymaker. See Simmons, 947 F.2d at 1062 (stating that a Monell plaintiff "must both identify individuals with ultimate policymaker authority in the area in question and adduce scienter-like evidence . . . with respect to them" (discussing Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989)); cf. Santiago v. Warminster Twp., 629 F.3d 121, 135 n.11 (3d Cir. 2010) ("While [plaintiff] is correct that, whether Chief Murphy is a final policymaker is ultimately a legal rather than a factual question . . . that does not relieve her of the obligation to plead in some fashion that he had final policy making authority, as that is a key element of a Monell claim." (internal citation omitted)).

We therefore grant Defendant's Motion because Plaintiff has failed to meet his burden of producing evidence that establishes the essential elements of a § 1983 claim. See Weller v. Ransom-Garner, Civ. A. No. 05-2758, 2008 WL 2579748, at *4 (E.D. Pa. June 25, 2008) (granting defendant's motion for summary judgment in part when "[p]laintiff's response point[ed] to no evidence whatsoever that [bore] on the crucial questions of who the officials were that adopted the supposedly offending policies" and "[p]laintiff [did] not even attempt[] to name a single individual involved in those policymaking decisions" except for one individual who was clearly not involved).

## IV. CONCLUSION

For the foregoing reasons, we grant PHS's Motion for Summary Judgment. An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova
John R. Padova, J.
